# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | | |
|---|---|---|
| MARCOS BONILLA, | ) | |
| Plaintiff, | ) | Case  No. CV12-3278 AJW |
| v. | ) | |
| CAROLYN J. COLVIN[1], | ) | MEMORANDUM OF DECISION |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| Defendant. | ) | |

Plaintiff filed this action seeking reversal of the decision of the defendant, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

## Administrative Proceedings

The procedural facts, which are undisputed, are summarized in the joint stipulation. [JS 2].  In a December 2, 2011 written hearing decision that constitutes the Commissioner's final decision in this matter, the administrative law judge ("ALJ") found that plaintiff retained the residual functional capacity ("RFC") to perform jobs available in significant numbers in the national economy.  Therefore, the ALJ concluded

---

[1]    Carolyn W. Colvin is substituted for her predecessor in office, Michael J. Astrue.  See Fed. R. Civ. P. 25(d).

1  that plaintiff was not disabled from June 30, 2009 through the date of his decision. [Administrative Record

2  ("AR") 22-23].[2]

3  **Standard of Review**

4  The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial

5  evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.

6  2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than

7  a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.

8  2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

9  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is

10  required to review the record as a whole and to consider evidence detracting from the decision as well as

11  evidence supporting the decision.  Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

12  Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than

13  one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

14  Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.

15  1999)).

16  **Discussion**

17  **Listing of impairments**

18  Plaintiff contends that the ALJ erred in finding that his impairments failed to meet or equal the

19  listing for mental retardation in 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.05C.  [JS 3-11].

20  A claimant is presumptively disabled and entitled to benefits if he or she meets or equals a listed

21

22  [2]   Plaintiff filed a prior application for SSI benefits that was denied through the period ending
on June 27, 2009 and was not appealed. [See AR 71-84].  The ALJ did not reopen that application

23  or reconsider the merits of the prior decision. [AR 11].  See Lester v. Chater, 81 F.3d 821, 827 (9th
Cir. 1995) (holding that the Commissioner properly applied res judicata to bar reconsideration of

24  a period for which a prior, final determination had been made by declining to reopen the prior
application); see also Udd v. Massanari, 245 F.3d 1096, 1098-1099 (9th Cir. 2001) ("A decision not

25  to reopen a prior, final benefits decision is discretionary and ordinarily does not constitute a final
decision; therefore, it is not subject to judicial review.") (citing Califano v. Saunders, 430 U.S. 99,

26  107-109 (1977)).

27  Plaintiff filed his current SSI benefits application on June 30, 2009. [AR 11].  The ALJ did
not apply a presumption of continuing non-disability because he concluded that there had been an

28  increase in the severity of plaintiff's impairments. [AR 21 n.1].  See Lester, 81 F.3d at 827-828.

2

impairment. To "meet" a listed impairment, a disability claimant must establish that his condition satisfies each element of the listed impairment in question.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999).  To "equal" a listed impairment, a claimant "must establish symptoms, signs, and laboratory findings" at least equal in severity and duration to each element of the most similar listed impairment.  Tackett, 180 F.3d at 1099-1100 (quoting 20 C.F.R. 404.1526); see Sullivan, 493 U.S. at 531.

The structure of listing 12.05 for mental retardation "is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that [the claimant's] impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00A.

The introductory paragraph of listing 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. [¶] The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Listing 12.05C states that a claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. When a claimant's verbal, performance, and full scale IQs differ, "the lowest of these [is used] in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D.6.c.

The ALJ found that on June 30, 2011, plaintiff

achieved valid Wechsler Adult Intelligence Scale - IV (WAIS - IV) IQ scores of 66 (Verbal), 84 (Performance), and 67 (Full Scale).  Although two of these IQ scores fall in the 60 through 70 ranges, as discussed below, and there are issues of validity, the claimant's other physical and mental impairments are not severe enough to impose additional significant limitations on the claimant's ability to work.

1    [AR 18 (citing Exhibit 15F, page 6)].

2      Plaintiff contends that since the ALJ found plaintiff's IQ scores "valid," his subsequent reference

3 to "issues of validity" in those scores is internally inconsistent and inconsistent with the record.  Plaintiff

4 also contends that the ALJ's finding that plaintiff had severe impairments (arthritis, polysubstance abuse,

5 bipolar disorder, schizophrenia, and borderline intellectual functioning) is sufficient to satisfy the second

6 prong of listing 12.05C.

7      In support of his finding that plaintiff did not meet or equal listing 12.05C, the ALJ cited a June 30,

8 2011 neuropsychological evaluation conducted by neuropsychologist Dr. Back-Madruga at the request of

9 plaintiff's treating psychiatrist, Dr. Turken. [AR 566-576].  Dr. Back-Madruga elicited a history from

10 plaintiff, made "behavioral observations" regarding plaintiff's presentation and mental status, administered

11 numerous psychological tests, provided an analysis of the test results, gave a diagnosis, and made treatment

12 recommendations to Dr. Turken. [AR 566-576].

13      Dr. Back-Madruga remarked that plaintiff "appeared to be putting forth his best effort on the various

14 neuropsychological tests," and that his test results were "credible and an accurate representation of his

15 current level of intellectual and cognitive functioning." [AR 569, 572].  She concluded, however, that while

16 plaintiff's WAIS - IV results fell within "the extremely low range for his age," his "General Ability Index

17 (GAI) is a better indicator of his cognitive abilities" because it is "less sensitive to the influence of timed

18 tests measuring working memory and processing speed." [AR 570, 573]. Based on his GAI score of 73, Dr.

19 Back-Madruga opined that plaintiff's intellectual functioning fell within the "borderline range." [AR 573].

20 Dr. Back-Madruga noted that while plaintiff's IQ scores and his "reported longstanding low academic and

21 adaptive functioning are suggestive of an intellectual disability (e.g., Mild Mental Retardation)," a "review

22 of school records and assessment of adaptive functioning are necessary to substantiate the diagnosis."[3] [AR

23 573].  She concluded that plaintiff "meets criteria for DSM-IV diagnosis of Cognitive Disorder NOS [not

24 

25      [3]   Dr. Back-Madruga said that plaintiff gave a history of "pervasive memory, language, attention, and perception problems" since childhood. [AR 566]. Plaintiff "reported having difficulty

26 learning throughout his life and was unable to keep up with his peers in school . . . ." [AR 567].  Although he remained in regular classes and did not repeat a grade, plaintiff said that he typically

27 failed his classes and could only read and write at a third-grade level. [AR 566-568 ].  Plaintiff told Dr. Back-Madruga that he stopped going to school after the seventh grade but did not say why. [AR

28 567].

1    otherwise specified]; Mild Mental Retardation (provisional); and per history, Reading Disorder,

2    Mathematics Disorder, and Disorder of Written Expression." [AR 574].

3         At first glance, the ALJ's statement that "there are issues of validity" with those scores appears to

4    be inconsistent with his finding that plaintiff's IQ scores were "valid."   However, the ALJ's subsequent

5    discussion of Dr. Back-Madruga's evaluation indicates that the ALJ was referring to Dr. Back-Madruga's

6    conclusion that plaintiff's IQ scores standing alone were not as good an indicator of his cognitive abilities

7    as his GAI score.   [See AR 20 (stating that Dr. Back-Madruga noted that plaintiff's GAI score was

8    "probably the most accurate indicator of the claimant's cognitive abilities")].   The Commissioner's

9    regulations contemplate just this sort of synthesis in analyzing IQ test results.   See 20 C.F.R. Pt. 404, Subpt.

10   P, App.1, § 12.00D.6.a ("[S]ince the results of intelligence tests are only part of the overall assessment, the

11   narrative report that accompanies the test results should comment on whether the IQ scores are considered

12   *valid and consistent with the developmental history and the degree of functional limitation.*") (Italics added).

13

14        Dr. Back-Madruga was the only doctor to administer and interpret plaintiff's IQ and other

15   psychological test results.   Accordingly, her interpretation of plaintiff's IQ scores and other psychological

16   test results is uncontroverted.   Moreover, Dr. Turken, plaintiff's treating psychiatrist, and Dr. Ritvo, the

17   Commissioner's consultative psychiatrist, concluded that plaintiff's intellectual functioning was

18   "borderline" or "borderline or low average range," consistent with Dr. Back-Madruga's opinion. Therefore,

19   Dr. Back-Madruga's opinion constitutes substantial evidence supporting the ALJ's finding that while

20   plaintiff's IQ results were within the prescribed range, his mental impairment did not meet or equal listing

21   12.05C. See Gray v. Comm'r of Soc. Sec. Admin., 365 Fed.Appx. 60, 62 (9th Cir. 2010) (holding that

22   substantial evidence supported the ALJ's finding that the claimant's mental impairments did not equal

23   listing 12.05C where medical opinions and other evidence undermined the reliability and validity of the

24   claimant's IQ scores).

25        Defendant's contention that plaintiff waived the issue of disability based on mental retardation by

26   failing to raise it at the administrative level lacks merit. [JS 5-6].   The ALJ explicitly considered, and made

27   findings on, the issue of whether plaintiff met or equaled listing 12.05 for mental retardation, and plaintiff

28   properly raised that issue in this action for judicial review of the ALJ's decision.  See Bergfeld v. Barnhart,

                                                                5

361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005) ("A reviewing federal court will only address the issues raised by the claimant in his appeal from the ALJ's decision.") (citing Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001)).

Defendant also contends that plaintiff did not meet his burden to prove that he had deficits in adaptive functioning prior to age 22, as required by listing 12.05C. [JS 6-7]. Plaintiff argues the ALJ did not make a finding as to whether or not plaintiff established onset before age 22, and therefore his decision cannot be affirmed on that basis. [JS 9]. See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts.").

Plaintiff is correct that the ALJ did not make an explicit finding under listing 12.05C regarding the onset date. Nonetheless, the ALJ's discussion of Dr. Back-Madruga's evaluation creates a reasonable inference that he found insufficient evidence in the record to establish onset of mental retardation prior to age 22. See Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (stating that a "reviewing court" is not precluded from "drawing specific and legitimate inferences from the ALJ's opinion," provided "those inferences are there to be drawn"). The ALJ wrote that Dr. Back-Madruga "noted that the claimant's overall testing results pointed to a diagnosis of mild mental retardation," but "also noted that she needed other medical records to confirm such a diagnosis." [AR 20]. The ALJ apparently was referring to Dr. Back-Madruga's statement that plaintiff's low IQ scores and "reported longstanding low academic and adaptive functioning" were "suggestive of" mild mental retardation, but that "school records and assessment of adaptive functioning are necessary to substantiate the diagnosis." [AR 573]. Since she lacked those records, she gave plaintiff only a "provisional" diagnosis of mild mental retardation. [AR 574]. The ALJ also said that plaintiff told Dr. Back-Madruga that he was able to attend regular classes without repeating a grade. [AR 20]. It is reasonable to infer from the ALJ's discussion that he found the evidence of record insufficient to establish deficits in adaptive functioning prior onset prior to age 22. Substantial evidence supports that determination.

For all of these reasons, plaintiff's contentions regarding the ALJ's step three finding lack merit.

**RFC Assessment**

Plaintiff contends that the ALJ's RFC finding is not based on substantial evidence and is legally erroneous.

6

1    The ALJ found that plaintiff has the RFC to perform medium work, except that he is limited to

2    simple, repetitive tasks and can "maintain reasonable relationships with the public, coworkers, and

3    supervisors during the workday on a frequent basis." [AR 18].  Plaintiff contends that in arriving at this RFC

4    assessment, the ALJ: (1)  improperly evaluated the medical opinion evidence [JS 11-17]; and (2) erred in

5    failing to make a proper determination whether plaintiff's alcohol or drug addiction was a contributing

6    factor material to the disability determination. [JS 17].

7                            **Medical opinion evidence**

8            The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record,

9    for rejecting an uncontroverted treating or examining source medical opinion. If contradicted by that of

10   another doctor, a treating or examining source medical opinion may be rejected for specific and legitimate

11   reasons that are based on substantial evidence in the record.  <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359

12   F.3d 1190, 1195 (9th Cir. 2004); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); <u>Lester</u>

13   <u>v. Chater</u>, 81 F.3d 821, 830-831 (9th Cir. 1995).

14           Plaintiff's testimony and the documentary evidence show that starting in August 2007, plaintiff

15   received psychiatric treatment from Dr. Collins and other physicians at AltaMed Health Services

16   ("AltaMed") for complaints of depression, hearing voices, and other symptoms.[4] [AR 51-53, 182-202, 232-

17   378].  The only AltaMed psychiatric progress note from the relevant period is a July 1, 2009 progress note

18   by Dr. Collins stating that plaintiff complained of anxiety, depression, hearing voices, and suicidal thoughts.

19   [AR 14, 182-185].  Plaintiff's diagnosis was bipolar I disorder, recent episode, depressed, under poor

20   control. He was prescribed anti-depressant, anti-psychotic medications. [AR 183-184].

21   _____

22      [4]    The prior hearing decision denying benefits mentions additional treatment records from late
     2007 and from 2008 for schizoaffective disorder from Los Angeles County Department of Mental
23   Health, East Los Angeles Mental Health Services, and Enki Health & Research Systems. [AR 75-
     76].  That decision also notes that on March 25, 2009, Dr. Collins "assessed the claimant with
24   moderate to extreme limitations in occupational functioning," including marked limitations in
     carrying out detailed instructions, making simple work-related decisions, and interacting
25   appropriately with supervisors and coworkers, and extreme limitations in understanding and
     remembering detailed instructions; interacting appropriately with the public; and responding
26   appropriately to work pressure and changes in a work setting." [AR 76].  Those records, which are
     not reproduced in the current record, are referenced here to show that the ALJ's characterization of
27   plaintiff's treatment history prior to seeing Dr. Ritvo and Dr. Turken was not based on substantial
28   evidence in the record.

In November 2009, Dr. Ritvo conducted a psychiatric evaluation at the Commissioner's request. Dr. Ritvo commented that plaintiff was a "very poor historian" who could recall some things well but appeared to have "large gaps in his memory or understanding of my questions." [AR 386]. Dr. Ritvo added that while plaintiff initially "appeared evasive . . . as the interview progressed it appeared that he simply did not have a good memory as to what had happened over the course of his life." [AR 389]. Plaintiff reported that he received general relief, lived in a trailer, did not have a driver's license, did not have friends, and spent time playing with his cats. He reported hearing voices and noises in his head since early childhood. He denied visual hallucinations. Plaintiff said that his family moved after he finished seventh grade, and he did not return to school after the move. He said that he liked to be alone and had trouble getting along with others. He denied street drug use or excessive alcohol use. He said that he had 45 arrests for "various offenses" and had spent time in prison. [AR 387-388]. Based on his mental status examination findings, Dr. Ritvo estimated plaintiff's intellectual functioning to be at the borderline level. [AR 389].

Dr. Ritvo remarked that because plaintiff was a poor historian and there were no records to review, his assessment was "tentative," and it was "very difficult to arrive at a diagnosis . . . ." [AR 387, 389]. Dr. Ritvo's "best impression at this time is that [plaintiff] does have auditory hallucinations and probably some delusional thinking which I will classify as psychosis pending further information." [AR 390]. Dr. Ritvo opined that plaintiff had a minor impairment in the ability to understand, remember, or complete simple commands, and a moderate impairment in the ability to understand, remember, or complete complex commands; interact appropriately with supervisors, coworkers, and the public; comply with job rules such as safety and attendance; respond to change in the normal workplace setting; and maintain persistence and pace in a normal workplace setting. [AR 390]. Dr. Ritvo gave plaintiff a current Global Assessment of Function ("GAF") score of 50, indicating serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job.[5]

---

[5] The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") Multiaxial Assessment, 27-36 (rev. 2000)); see also Vargas

On December 7, 2009, Dr. Balson, a non-examining state agency physician, completed a "Psychiatric Review Technique" form and a mental RFC assessment form. [AR 397-410]. Dr. Balson indicated that plaintiff had a psychotic disorder, NOS, and a substance addiction disorder that were severe but did not meet the listing criteria in any of the four functional domains (activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration). [AR 397, 399, 403, 405]. Dr. Balson assessed plaintiff with "moderate" limitations in several work-related functional abilities. [AR 408-109]. He concluded, however, that plaintiff could "predictably sustain" simple, repetitive task, provided he had attained and would maintain sobriety. [AR 410].

In August 2010, shortly after the date of his last treatment report from AltaMed, plaintiff underwent an initial mental health assessment by an LAC-USC social worker. [AR 519-520]. The social worker noted that plaintiff was "self-referred" and "is followed by Dr. Tso, is a recent transfer from AltaMed." [AR 519]. Plaintiff reported that he had been homeless for four months and was sleeping in a car. [AR 519-520]. In December 2010, it was noted that plaintiff transferred to the Rand Schrader Clinic, where Dr. Turken saw him, from "Dr. Tso's night clinic. The patient states that he transferred to our daytime clinic because it is easier to come to our clinic during the day." [AR 449].

On October 20, 2010, plaintiff presented to Dr. Turken at Los Angeles County-USC Medical Center ("LAC-USC") Rand Schrader Clinic for treatment of his bipolar disorder. [AR 509]. Plaintiff reported that he lived in an old trailer without utilities. He gave a history of chronic auditory hallucinations (voices telling him what to do); episodes of self-injury in response to such "command auditory hallucinations"; chronic depression; chronic memory problems; illiteracy; childhood neglect; long-term homelessness after the age of 13, when he left school and his mother kicked him out of the house "because he no longer came with a welfare check"; a history of head trauma; multiple arrests; several stints in prison for drug sales, burglary, and other offenses; use of marijuana a week earlier, but not for "months" before that; and past, but not current, use of alcohol. [AR 509-512]. Plaintiff denied other drug use. When confronted with his positive

v. Lambert, 159 F.3d 1161, 1164 (9th Cir. 1998) (describing a GAF score as "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment").

urine toxicology screen for cocaine three months earlier, plaintiff said that his use of cocaine on that occasion was an "exception." [AR 509-512]. Dr. Turken reported that plaintiff was "completely preoccupied with getting pain medicine" for his various pain complaints. [AR 510]. His primary care team had not given him pain medication because of his positive toxicology test. [AR 510].

On mental status examination, Dr. Turken observed that plaintiff was polite, childish, selectively cooperative, and "repetitiously" demanded pain medication. He had a minimal speech impediment; a somewhat odd affect, with mild constriction in range; and reported recent, but no current, hallucinations or other abnormalities of thought content. Plaintiff's thought processes were linear and concrete. He needed external prompting to maintain attention. He was oriented in all spheres. His intelligence was estimated in the borderline to low average range. His insight, judgment, and impulse control were limited. [AR 512].

Dr. Turken listed the following "major psychiatric diagnoses": (1) "[s]chizoaffective disorder, provisional (rule out psychotic disorder due to developmental disorder, rule out due to drugs or general medical condition, rule out bipolar)"; (2) alcohol, cocaine, marijuana abuse/dependence, in remission by history; and (3) cognitive disorder, NOS. Dr. Turken also diagnosed personality disorders: developmental disorder, NOS; reading disorder; disorder of written expression; and mathematics disorder. [AR 512-513]. Dr. Turken continued plaintiff's psychotropic medication, ordered a toxicology screen, and referred him for neuropsychological testing to evaluate cognitive impairment and possible developmental disorder. [AR 513]. He gave plaintiff a current GAF score of 40, signifying some impairment in reality testing or communication or a major impairment in several areas, and an estimated past year GAF score of 45, signifying serious symptoms or any serious impairment in social, occupational, or school functioning. See note 5, supra.

As noted above, Dr. Turken referred plaintiff to Dr. Back-Madruga for neuropsychological testing in June 2011. In addition to her findings regarding plaintiff's IQ scores, Dr. Back-Madruga concluded that plaintiff exhibited "marked impairment" in immediate attention, language skills, and verbal memory, and "moderate to marked deficits" in "visual mental speed, nonverbal (visual) memory, paper and pencil constructional skills, and executive functioning." [AR 573]. Plaintiff also exhibited "moderate dysfunction" in "non-dominant hand motor speed and dexterity." [AR 573]. Plaintiff scored in the severe range of depression and the moderate range of anxiety on self-report inventory scales. [AR 568, 573]. In addition

to noting that plaintiff appeared to have "long standing developmental issues," Dr. Back-Madruga noted that plaintiff's hepatitis C, history of polysubstance abuse, chronic current cannabis use, HIV infection, recurrent head trauma, seizure disorder, and schizoaffective disorder could be related to his cognitive, attention, memory, motor speed, and other deficits. [AR 573]. She explained that research had shown that each of those disorders was positively associated with certain cognitive or other deficits. [AR 573-574].

Among other things, Dr. Back-Madruga recommended that: (1) "[g]iven plaintiff's multiple cognitive deficits, he will need continued aid in his living environment for assistance with higher level activities of daily living (e.g., medication management, etc.)"; (2) "continued substance abuse treatment" to address "chronic marijuana use"; and (3) "[c]ontinued treatment with psychiatry and social work" to treat plaintiff's "depressive and anxiety symptoms," which "appear prominent at this point." [AR 574].

The ALJ rejected the opinions of Dr. Ritvo, Dr. Turken, and Dr. Back-Madruga insofar as they indicated that plaintiff's mental RFC was more limited than the ALJ found, and concluded that Dr. Balson's opinion was "reasonably consistent with the overall record." [AR 19-20]. The ALJ noted that Dr. Ritvo and Dr. Turken assessed plaintiff "at times when [plaintiff] had not received psychiatric treatment for some time," "was not compliant with previously prescribed medical treatment," and "failed to properly seek out reasonable psychiatric treatment for his conditions," or, stated another way, when plaintiff was not "receiving appropriate treatment supported by a treatment record at relevant times proximate to the evaluations." [AR 19-20]. The ALJ also said that there was no documentary evidence that Dr. Turken treated plaintiff after initially evaluating him on October 20, 2010, and that both Dr. Turken and Dr. Ritvo "largely based their assessments on [plaintiff's] reported symptoms and limitations," which the ALJ found not credible.[6] [AR 19-20].

The ALJ's reasons for rejecting the controverted treating and examining source opinions were not specific, legitimate, and based on substantial evidence in the record. Plaintiff's psychiatric treatment history is not a legitimate reason for rejecting the opinions of Dr. Ritvo or Dr. Turken. Plaintiff received ongoing

---

[6]   Plaintiff does not challenge the ALJ's credibility determination, which was supported by substantial evidence detracting from plaintiff's overall credibility, including his multiple inconsistent statements about his drug and alcohol use, history of incarceration, and limited work history. [AR 21-22].

psychiatric treatment at AltaMed between August 2007 and July 2009, prior to seeing either of those two doctors. Plaintiff was seen by Dr. Collins or another AltaMed physician seven times between 2007 and 2009 for a diagnosis of bipolar disorder, severe, with psychotic behavior or with depression. [AR 182-202]. Although the AltaMed treatment reports do not document a visit with a psychiatrist after July 2009, plaintiff continued to receive follow-up care there on a regular basis through July 2010, including receiving refills of his psychiatric medications. [See AR 521-541].   Indeed, at his consultative examination with Dr. Ritvo in November 2009, plaintiff brought with him psychiatric medications that had been prescribed by Dr. Collins. [See AR 387]. Dr. Ritvo could not ascertain the details of plaintiff's treatment history and did not have plaintiff's AltaMed records to review, but the record as a whole indicates that plaintiff was in ongoing psychiatric treatment for over two years when he saw Dr. Ritvo and over three years when he first saw Dr. Turken.

Viewed as a whole, the record indicates that plaintiff sought, obtained, and complied with psychiatric treatment on a reasonably consistent basis both before and during the relevant period despite significant barriers to care, including his indigency, homelessness, lack of social support, possible substance abuse, and mental impairments that the ALJ found to be severe.   On this record, plaintiff's treatment history and compliance with treatment are not legitimate reasons for rejecting the examining or treating source opinions. See Regennitter v. Comm'r, Soc. Sec. Admin., 166 F.3d 1294, 1299-1300 (9th Cir. 1999) ("[W]e have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'") (quoting Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)).

The ALJ also rejected the examining and treating source reports because the AltaMed records indicated that plaintiff was not compliant with his medication, and because his psychiatric conditions are fairly controlled when plaintiff is compliant. [AR 19-20]. The only AltaMed treatment report that falls within the relevant period (after June 30, 2009) indicated that plaintiff's bipolar disorder with psychosis was severe and was under "poor control," and there was no notation in that report of noncompliance. [AR 182-184]. Dr. Turken did not indicate that plaintiff was noncompliant.   Therefore, substantial evidence does not

1    support the ALJ's determination that plaintiff's psychiatric conditions were, or could be, fairly controlled

2    with medication during the relevant period.

3         Another reason given by the ALJ for rejecting Dr. Turken's assessment was the lack of

4    "development of [plaintiff's] mental health records." [AR 20].  The ALJ noted that plaintiff told Dr. Back-

5    Madruga that he was under Dr. Turken's care and had last seen him in March 2011, but that the record does

6    not contain treatment notes from Dr. Turken after plaintiff's October 2010 visit.  Since Dr. Turken referred

7    plaintiff to Dr. Back-Madruga, there is no reason to doubt the veracity of plaintiff's statement that he was

8    still under Dr. Turken's care and had seen him quite recently.  There is no indication in the record that the

9    ALJ attempted to obtain additional treatment records from Dr. Turken or asked plaintiff's counsel to do so.

10        "In Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to

11   ensure that the claimant's interests are considered, even when the claimant is represented by counsel."

12   Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); see Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.

13   1996).  The ALJ should not have relied on the absence of updated treatment records from Dr. Turken that

14   were likely to exist and to be probative without first attempting to obtain them.  Cf. Tidwell v. Apfel, 161

15   F.3d 599, 602 (9th Cir. 1998) (holding that where the ALJ concluded that a form submitted by a treating

16   physician was inadequate, he fulfilled his duty to develop the record where he voiced his concerns to the

17   claimant's counsel, requested an additional inquiry into the basis for the doctor's opinions, and explained

18   that he would keep the record open for supplemental responses).

19        In addition, the ALJ impermissibly rejected the assessments of Dr. Ritvo and Dr. Turken because

20   they were based "largely on" plaintiff's subjective symptoms and limitations.  [AR 20].  In general, the

21   existence of a mental impairment is established by medical evidence consisting of signs, symptoms, and

22   laboratory findings. Symptoms are the claimant's description of his or her impairment, while psychiatric

23   signs are medically demonstrable and observable phenomena which indicate specific abnormalities of

24   behavior, affect, thought, memory, orientation, and contact with reality. Medically acceptable laboratory

25   findings include psychological test results. 20 C.F.R. §§  404.1508, 416.908; 404.1520a(b)(1),

26   416.920a(b)(1); 404.1528(b)&(c), 416.928(b)&(c).  Psychiatric impairments are "not as readily amenable

27   to substantiation by objective laboratory testing as a medical impairment. [C]onsequently, the diagnostic

28

13

1   techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of

2   medicine." Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989) (per curiam) (ellipses omitted)

3   (quoting Poulin v. Bowen , 817 F.2d 865, 873-874 (D.C. Cir. 1987)). "When mental illness is the basis of

4   a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals

5   trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because

6   of the relative imprecision of the psychiatric methodology or the absence of substantial documentation,

7   unless there are other reasons to question the diagnostic techniques." Blankenship, 874 F.2d at 1121(quoting

8   Poulin, 817 F.2d at 873-874); see Ferrando v. Comm'r of Soc. Sec. Admin. 449 Fed. Appx. 610, 612 n.2

9   (9th Cir. 2011) ("[M]ental health professionals frequently rely on the combination of their observations and

10   the patient's reports of symptoms (as do all doctors) . . . . To allow an ALJ to discredit a mental health

11   professional's opinion solely because it is based to a significant degree on a patient's 'subjective allegations'

12   is to allow an end-run around our rules for evaluating medical opinions for the entire category of

13   psychological disorders."); see also Regennitter, 166 F.3d at 1298.[7]

14          There is no indication that Dr. Ritvo and Dr. Turken impermissibly or uncritically accepted

15   plaintiff's subjective complaints at face value.  Rather, they permissibly relied on plaintiff's subjective

16   symptoms and limitations as part of their overall psychiatric evaluation.  Dr. Ritvo qualified his opinion

17   because plaintiff was a poor historian and because he lacked access to medical records.  However, Dr. Ritvo

18   ultimately concluded that plaintiff was not being evasive, but rather had gaps in his memory or

19   understanding that were consistent with cognitive and memory deficits.  Despite his reservations about

20   having inadequate information on which to base his assessment, Dr. Ritvo's findings that plaintiff had

21   borderline intellectual functioning and a psychotic disorder were consistent with the assessments of Dr.

22

23          [7]In Regennitter, the Ninth Circuit held that the ALJ erred in rejecting an examining psychologist's

24   functional assessment on the grounds that the examiner's conclusions were inconsistent with the
     "benign" results of a mental examination, and because the physician took the claimant's statements

25   "at face value."  The court explained that: (1) the psychologist's findings were essentially consistent
     with another examiner's report; (2) the psychologist interviewed and tested the claimant, and made

26   findings that were consistent with his conclusions; (3) the psychologist explained how his findings
     supported his diagnoses; and (5) in the absence of any evidence that the claimant was malingering,

27   the examiner should not be faulted for believing the claimant's complaints.  Regennitter, 166 F.3d

28   at 1299-1300.

14

Turken and Dr. Back-Madruga, who relied on psychological test results as well as on plaintiff's subjective history. Moreover, the ALJ's finding that plaintiff's subjective allegations are not credible does not, without more, justify rejecting the opinions of treating or examining physicians who found his subjective presentation credible. See Regennitter, 166 F.3d at 1299-1300 (stating that in the absence of any evidence that the claimant was malingering, the examiner should not be faulted for believing the claimant's complaints).

The ALJ credited Dr. Back-Madruga's conclusion that the evidence was insufficient to support a diagnosis of mental retardation, but he erred in rejecting the cognitive and other limitations she described without articulating specific and legitimate reasons.

The ALJ concluded that Dr. Balson's opinion that plaintiff could "predictably sustain" simple, repetitive tasks if he has attained and maintains sobriety was "reasonably consistent with the overall record," but the ALJ gave plaintiff the "benefit of the doubt" and added a restriction to "maintaining reasonable relationships with the public, coworkers, and supervisors during the workday on a frequent basis." [AR 21 & n.1]. The opinion of a non-examining physician such as Dr. Balson does not alone constitute a specific, legitimate reason for rejecting the contrary opinion of a treating or examining physician, but it may constitute substantial evidence when it is consistent with other independent evidence in the record. Tonapetyan, 242 F.3d at 1148; Magallanes, 881 F.2d at 752. The ALJ acknowledged that Dr. Balson's opinion understated the evidence of record regarding plaintiff's difficulties with social interaction. [AR 21 & n.1]. Furthermore, Dr. Balson's opinion was not consistent with Dr. Ritvo's opinion or with other independent evidence in the record. While both Dr. Balson and Dr. Ritvo found that plaintiff had no more than a mild limitation in understanding, remembering, and completing simple instructions, along with other mild or moderate limitations, only Dr. Balson concluded that plaintiff could "predictably sustain" simple, repetitive tasks, assuming he was sober and remained so. Dr. Ritvo did not opine that plaintiff could "predictably sustain" even simple, repetitive tasks with all of the additional "moderate" limitations assessed in his report, even if plaintiff was sober. Moreover, the vocational expert testified that a person with all of the mental functional limitations identified by Dr. Ritvo could *not* perform plaintiff's past relevant work or any other work in the national economy. [AR 65]. The reliability of Dr. Balson's opinion is further

1   undermined because Dr. Balson did not have the opportunity to review the reports of Dr. Turken or Dr.

2   Back-Madruga.        For all of the foregoing reasons, the ALJ did not properly evaluate the medical

3   opinion evidence in reaching his RFC finding.[8]

4   **Remedy**

5       The choice whether to reverse and remand for further administrative proceedings, or to reverse and

6   simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th

7   Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of

8   benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038

9   (2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand

10  to the agency for additional investigation or explanation." Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir.

11  2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).   A district court, however,

12      should credit evidence that was rejected during the administrative process and remand for

13      an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for

14      rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

15      determination of disability can be made; and (3) it is clear from the record that the ALJ

16      would be required to find the claimant disabled were such evidence credited.

17  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178). The Harman test

18  "does not obscure the more general rule that the decision whether to remand for further proceedings turns

19

20      [8]    Plaintiff also contends that the ALJ erred by failing to determine whether plaintiff's alcohol

21  or drug addiction was a contributing factor material to the disability determination.  That argument
    lacks merit.  A claimant is not eligible to receive disability benefits if drug or alcohol addiction is

22  a "contributing factor material to the determination of disability."  20 C.F.R. §§ 404.1535(a),
    416.935(a).  If the Commissioner finds that the claimant is disabled and has medical evidence of the

23  claimant's drug addiction or alcoholism, the Commissioner must determine if the claimant would

24  still be disabled if he or she stopped using drugs or alcohol.  20 C.F.R. §§ 404.1535(b), 416.935(b);
    Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied, 552 U.S. 1141 (2008).  If, however,

25  "the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not
    entitled to benefits and there is no need to proceed with the analysis under 20 C.F.R. §§ 404.1535

26  or 416.935."  Bustamante v. Massanari,  262 F.3d 949, 955 (9th Cir. 2001).  The ALJ concluded

27  that plaintiff is not disabled, so his failure to determine whether substance addiction was a
    contributing factor material to the disability determination is not error.

28

upon the likely utility of such proceedings." <u>Harman</u>, 211 F.3d at 1179; <u>see</u> <u>Benecke</u>, 379 F.3d at 593 (noting that a remand for further administrative proceedings is appropriate "if enhancement of the record would be useful").

A remand for further administrative proceedings is the appropriate remedy in this case.  While the ALJ did not give legally sufficient reasons for rejecting the examining and treating source opinions, Dr. Ritvo's opinion is too equivocal to justify an award of benefits, and neither Dr. Turken nor Dr. Back-Madruga specifically assessed plaintiff's work-related functional limitations.  On remand, the ALJ should obtain updated treating source records, ensure that the record is fully developed, conduct a new hearing, and issue a new opinion containing appropriate findings.

## Conclusion

For the reasons stated above, defendant's decision is reversed, and this matter is remanded to defendant for further administrative proceedings consistent with this memorandum of decision.

June 5, 2013

ANDREW J. WISTRICH
United States Magistrate Judge

17